**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NORTH CAROLINA**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JASON DONNELL JOYNER,<br><br>Plaintiff,<br><br>v.<br><br>JAMES L. HEAD, *in his individual and official capacities*, GARY HOWARD, *in his individual and official capacities*, and CITY OF GREENVILLE, NORTH CAROLINA<br><br>Defendants. | ) | **Case No. 4:26-cv-00004**<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

COMES NOW, Plaintiff, Jason Donnell Joyner, by and through his attorneys, and bring this action against Defendants James L. Head ("Defendant Head"), in his individual and official capacities, Gary Howard ("Defendant Howard"), in his individual and official capacities, and the City of Greenville, North Carolina ("Defendant City"). Plaintiff alleges upon knowledge, information and belief the following:

## INTRODUCTION

1. On the evening of April 30, 2024, Plaintiff Jason Donnell Joyner (hereinafter "Mr. Joyner"), a then-42-year-old black man, was wrongfully arrested on heroin trafficking charges by Defendant Head, a sworn police officer at the Greenville Police Department ("GPD"). Mr. Joyner did not possess any drugs that night; instead, he had the remnants of a brownie in a plastic sandwich bag that Defendant Head unreasonably presumed to be drugs.

2. Mr. Joyner was in the passenger seat of his friend's car in Greenville, North Carolina when Defendant Head conducted a traffic stop for an expired plate. During the stop, a sandwich bag containing the remnants of a brownie fell out of Mr. Joyner's pocket.

3. There were no drugs, money, scales, or drug paraphernalia in the car, Mr. Joyner's backpack, or his pockets. Mr. Joyner had no history of possessing, using or selling drugs. And he repeatedly told Defendant Head that the sandwich bag contained a brownie, not drugs.

4. At the scene, Defendant Head remarked that the sandwich bag contents looked like "brown sugar," the consistency did not appear to be powder, and it could be anything. The watch commander, Defendant Howard, inspected the brownie remnants with Defendant Head and said he honestly did not know what was in the sandwich bag.

5. Despite the lack of evidence or any other indication that the sandwich bag contained drugs, Defendant Head decided not to conduct a field test or use a TruNarc handheld narcotics analyzer to test the brownie remnants. Instead, Defendant Head arrested Mr. Joyner and secured a warrant charging him with trafficking heroin. Defendant Head acted with no concern about the likelihood that Mr. Joyner was innocent. He told Defendant Howard that the charge would get dismissed if lab tests showed the sandwich bag contained no drugs.

6. Mr. Joyner was held in jail for 43 days on a $200,000 bond for a charge carrying a mandatory minimum sentence of 70 months in prison and a $500,000 fine. After bonding out of custody on June 12, 2024, Mr. Joyner remained on an ankle monitor and subject to a curfew for five more months. The charges against Mr. Joyner were

dismissed on or about November 19, 2024, after the crime lab determined the brownie remnants contained no controlled substances.

7. In those intervening months, as a result of this arrest, Mr. Joyner's life fell apart. He lost his job and his home. Mr. Joyner is still struggling to recover from the nightmare of his 43-day wrongful incarceration and his 5-month conditional bond. This could have all been avoided by a simple test.

8. Defendants Head and Howard were not reasonably trained or supervised and did not possess the necessary knowledge, skills or decision-making ability regarding the process for identifying drugs, field-testing suspected drugs, or making arrests in drug cases. These deficiencies by Defendant City led directly to the wrongful arrest of Mr. Joyner for carrying remnants of a brownie in his pocket.

9. The actions of Defendants, as described more fully herein, deprived Mr. Joyner of his well-established constitutional rights. Plaintiff brings this action for compensatory and punitive damages pursuant to 42 U.S.C. § 1983, and the Fourth Amendment to the United States Constitution, and under North Carolina law.

## PARTIES

10. **Plaintiff Jason Donnell Joyner** is and was at all relevant times a citizen and resident of Pitt County, North Carolina. Mr. Joyner is a black man who was, at the time of the subject arrest, 42 years old.

11. **Defendant James L. Head** is and was at all relevant times a sworn police officer at the GPD, located in Greenville, Pitt County, North Carolina. Upon information and belief, he is a citizen and resident of Pitt County, North Carolina. He is named as a

defendant in his individual capacity as to Counts I, V, and VI, and in his official capacity as to Count VI.

12. **Defendant Gary Howard** is and was at all relevant times a sworn police officer at the GPD, located in Greenville, Pitt County, North Carolina. Upon information and belief, Defendant Howard is a citizen and resident of Pitt County, North Carolina. He is named as a defendant in his individual capacity as to Counts II and VI and in his official capacity as to Count VI.

13. At all relevant times, in committing the acts and omissions herein alleged, each of the named Individual Defendants was acting under color of state law and within the scope of his employment with Defendant City and GPD.

14. **Defendant City of Greenville, North Carolina** is a municipal corporation created by an Act of the North Carolina General Assembly and organized by charter under Chapter 160A of the North Carolina General Statutes. Defendant City is in Pitt County, North Carolina.

15. Defendant City maintains and operates, pursuant to its charter, a city police force called the Greenville Police Department. Defendant City bears legal responsibility under state law for the acts and omissions of GPD officers in the course of their employment. Further, Defendant City has expressly ratified the conduct of Defendants Head and Howard in unreasonably seizing and charging Mr. Joyner.

16. Michael Cowin is and was at all relevant times the City Manager for the City of Greenville, North Carolina. In that position, he has final approval over the policies implemented by the Greenville Police Department. Richard Tyndall is the current Chief

of Police for the City of Greenville, North Carolina following his appointment as Interim Chief on April 1, 2025, and his promotion to Chief of Police on May 31, 2025. Ted Sauls, Jr. was at all relevant times the Chief of Police for the City of Greenville, North Carolina. The Chief of Police is the administrative head of the Greenville Police Department and prepares the policies for the Department.

17. Upon information and belief, Defendant City has waived its governmental immunity from the negligence of GPD police officers by obtaining insurance coverage and/or participating in a governmental risk pool that will indemnify Defendants Head and Howard from the claims in this case. Accordingly, Defendants have waived any governmental or public officer immunity that they might otherwise claim.

## JURISDICTION AND VENUE

18. This court has subject matter jurisdiction over this action pursuant to U.S.C. § 1331, because it is based on violations of 42 U.S.C. § 1983 (Counts I-IV).

19. This court has supplemental jurisdiction over Plaintiff's state law claims (Counts V-VI as applicable to state law claims) pursuant to 28 U.S.C. § 1367.

20. Defendants are each subject to the personal jurisdiction of this Court because they each reside in or have their principal place of business in Pitt County, North Carolina, which is within this judicial district. Further, Defendants are each present in and regularly conduct affairs and business activities in this judicial district and engaged in the conduct that is the subject of this lawsuit within this judicial district.

21. Venue is proper in the Eastern District of North Carolina, pursuant to, *inter alia*, 28 U.S.C. § 1931, as the events giving rise to this action occurred in Pitt County, and

upon information and belief, all Defendants reside or have their principal offices in Pitt County, which is within this judicial district.

22. This lawsuit was filed within all applicable statutes of limitations and repose.

## FACTS

### Jason Joyner is Unlawfully Arrested for His Possession of a Brownie

23. On April 30, 2024, Mr. Joyner met up with a friend in Greenville, North Carolina to repair a car. During that time, Mr. Joyner put the remnants of a brownie packaged in a plastic sandwich bag into the pocket of his jeans. After repairing the car, Mr. Joyner's friend drove him and another man back to Mr. Joyner's home in Greenville.

24. While en route, Defendant Head conducted a traffic stop of the car for an expired license plate. The driver pulled into a hotel parking lot. Mr. Joyner was in the front passenger seat, and another black man was in the back seat. While Defendant Head was speaking with the driver, the sandwich bag containing the remnants of a brownie fell out of Mr. Joyner's pocket. Defendant Head requested backup and detained all occupants of the vehicle based on his suspicion that the sandwich bag contained narcotics.

25. When additional GPD officers arrived at the scene, Mr. Joyner was removed from the car and handcuffed. Defendant Head thanked him for being cooperative. Mr. Joyner continued cooperating and consented to a search of his person. The GPD officer that searched him did not find any money, drugs, or drug paraphernalia. Mr. Joyner repeatedly told the GPD officers that the sandwich bag did not contain any drugs.

26. Defendant Head and other GPD officers searched the car and Mr. Joyner's backpack. They found no drugs, firearms, money, scales, drug ledgers, or other drug paraphernalia. Nothing in the car, Mr. Joyner's backpack, or his pockets suggested that he was involved in drug use or drug trafficking. GPD officers obtained Mr. Joyner's criminal history and determined he had no history of drug use or drug trafficking.

27. Defendant Head conferred with other GPD officers at the scene and inspected the brownie remnants in the sandwich bag. He determined the sandwich bag and brownie remnants weighed 8.3 grams, which is not a standard unit of heroin distribution. Defendant Head remarked that the contents looked like "brown sugar" to him. He said the consistency was "off" for it to be powder and that it could be anything. Defendant Head found a similar substance during a previous stop of a different individual, but he did not remember whether came back as heroin when it was lab tested.

28. Mr. Joyner waived his *Miranda* rights and agreed to speak with Defendant Head about the sandwich bag contents. He told Defendant Head multiple times that the sandwich bag contained a brownie. He told Defendant Head multiple times that the sandwich bag did not contain drugs. He asked Defendant Head multiple times to test the contents of the sandwich bag.

29. At the scene, Defendant Head conferred with Defendant Howard, a sworn police officer employed by GPD and the watch commander for Defendant Head's shift that night. Defendant Head told Defendant Howard about the lack of evidence of drug trafficking uncovered during the search – that there were no drugs, firearms, money, scales, drug ledgers, or other drug paraphernalia in the vehicle or Mr. Joyner's backpack.

30. Defendant Howard had also spoken with Mr. Joyner at the scene before meeting with Defendant Head. Mr. Joyner repeatedly told Defendant Howard that the sandwich bag did not contain any drugs.

31. Defendant Howard inspected the brownie remnants in the sandwich bag with Defendant Head. Defendant Howard remarked that he honestly did not know what was in the bag. Defendant Head, Defendant Howard, and another GPD officer discussed whether they could charge Mr. Joyner with an offense involving counterfeit drugs because they could not tell whether the sandwich bag actually contained drugs.

32. At this point in the investigation, Defendant Head had uncovered no contraband or anything indicative of criminal behavior:

a. Mr. Joyner had no criminal history involving drugs or drug trafficking.

b. GPD officers had conducted a thorough search of the car, bags inside the car, and Mr. Joyner's person but uncovered no drug paraphernalia or items indicative of drug sales (such as digital scales, plastic baggies, or large amounts of cash).

c. Defendant Head had not seen Mr. Joyner or the car interact with anyone before the traffic stop, as would have indicated they were engaged in drug trafficking.

d. Defendant Head did not even attempt to question Mr. Joyner about his itinerary that night.

e. Upon closer inspection of the sandwich bag, it was not immediately apparent to Defendant Head or his more experienced watch commander, Defendant Howard, that the sandwich bag contained drugs.

f. In fact, Mr. Joyner's explanation for the contents – a brownie – matched Defendant Head's description – brown sugar.

33. Faced with this lack of evidence, Defendant Head, Defendant Howard, and other GPD officers discussed (a) field testing the sandwich bag contents or (b) using a TruNarc handheld narcotics analyzer ("TruNarc") to determine whether the sandwich bag contained narcotics.

34. The TruNarc is a handheld tool that uses "lab-proven Raman spectroscopy" to allow officers to scan suspected drugs for more than 530 controlled substances in a single, definitive test. The TruNarc allows officers to scan directly through plastic or glass for most drug test samples to minimize contamination, reduce exposure and preserve evidence. According to marketing materials, with the TruNarc, "the accuracy and reliability of a narcotics and drug test lab are available anywhere you go."

35. In March 2023, GPD requested approval from the Greenville City Council to use asset forfeiture funds to purchase a TruNarc for $35,000. In the request, GPD described the TruNarc as a "[s]ystem used to analyze, identify and sample controlled substances without opening the package in which the substances are contained." The Greenville City Council unanimously approved GPD's request at the March 6, 2023, City Council meeting. On April 30, 2024, GPD officers had access to at least one TruNarc.

36. Defendant Head had obtained Mr. Joyner's address and criminal history during the investigation. Based on that information, Defendant Head knew that Mr. Joyner lived minutes away from the scene at an apartment in Greenville. Defendant Head knew Mr. Joyner had no outstanding warrants and had never been arrested for a drug offense, violent crime, or other serious offense. And based on his training as a law enforcement officer, Defendant Head knew that he could obtain a warrant for Mr. Joyner's arrest even if Mr. Joyner was released from the scene that evening.

37. As a result, Defendant Head knew he could have the sandwich bag contents examined with a field test or TruNarc at GPD and then obtain a warrant for Mr. Joyner's arrest if that testing determined the sandwich bag contained drugs. He did not do that.

38. Instead, Defendant Head told Defendant Howard that he was going to charge Mr. Joyner with trafficking heroin. Defendant Head said he would charge Mr. Joyner with a Schedule I substance until proved otherwise to "get him something." Defendant Head, apparently unconcerned with the present lack of evidence, said the charge would just get dismissed if testing showed the sandwich bag did not contain any drugs.

39. Defendant Howard approved Defendant Head's decision and did not instruct him to conduct a field test or TruNarc analysis before obtaining an arrest warrant.

40. Defendant Head arrested Mr. Joyner and transported him from the scene to secure a warrant for his arrest. During the ride to Pitt County Detention Center, Mr. Joyner again pleaded with Defendant Head to test the sandwich bag contents. Mr. Joyner truthfully told Defendant Head he had never used or sold drugs, and it was just a brownie.

41. Defendant Head responded that did not have to test the substance. And he repeated that the charge would be dismissed if the sandwich bag did not actually contain heroin, which was of little reassurance to Mr. Joyner, who was currently being arrested for a crime he did not commit and for which there was no evidence.

42. Defendant Head secured an arrest warrant in Pitt County, North Carolina charging Mr. Joyner with trafficking heroin by unlawfully, willfully, and feloniously possessing 4-14 grams of heroin, in violation of N.C.G.S. § 90-95(H)(4). That offense carries a mandatory minimum sentence of 70 months in prison and a fine of $500,000.

43. Defendant Head never used a field test or a TruNarc to determine whether the sandwich bag contained drugs. Nor did he ever obtain the help of another GPD officer to use a TruNarc to determine whether the sandwich bag contained drugs. Instead, the drugs were submitted into evidence and then sent to the crime lab for testing.

44. Based on their years of experience in law enforcement, Defendants Head and Howard knew or should have known it would take months to receive results of testing from the crime lab. It did.

**Jason Joyner Suffers in Jail for a Crime He Did Not Commit**

45. On May 1, 2024, Mr. Joyner had his first appearance and was given a $200,000 bond based on the severity of the crime for which he was wrongfully charged. On May 22, 2024, Mr. Joyner's bond was reduced to $150,000. It would take another three weeks for Mr. Joyner and his family to scrape together the money to pay his bond.

46. For 43 days, Mr. Joyner was incarcerated at the Pitt County Detention Center. There, he was housed with the inmates charged with the most serious crimes

because his charges carried such a lengthy sentence. Mr. Joyner struggled to cope with being in jail for a crime he did not commit. He was constantly afraid, struggled to eat or sleep at night, and suffered from anxiety, depression, and despair. Mr. Joyner also lost his job while incarcerated.

47. On June 12, 2024, Mr. Joyner was finally released from jail. Mr. Joyner continues to be burdened with the damage inflicted by his wrongful incarceration.

48. Even after Mr. Joyner's release from jail, his wrongful arrest continued to affect his life. For more than five months, he was forced to wear an ankle monitor and abide by a 7 p.m. to 7 a.m. curfew. His prior employer hired him back when he was released, but his hours were cut in half because his prior role had been filled by a replacement and he could not work nights with the curfew.

49. Mr. Joyner fell behind on his rent while incarcerated and could not make up the debt with his limited work hours. He was evicted and living in a hotel until alternative housing became available because he was not allowed to leave Pitt County.

50. Mr. Joyner's first grandchild was born shortly before his arrest, and he could not help his daughter at night because of the curfew and his unstable living situation. Through it all, Mr. Joyner suffered from mental distress as he struggled to understand how his life had been upended by a brownie in his pocket.

51. In summary, Mr. Joyner's past and ongoing injuries include but are not limited to:

a. humiliation, indignities, and embarrassment;

b. damage to his reputation;

c. damage to his family relations;

d. mental suffering, severe emotional distress, depression and anxiety;

e. loss of employment, wages, and benefits;

f. diminished earning capacity;

g. restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, employment, physical activity, personal fulfillment, parental responsibilities, travel, and the right to express oneself and to live a life of one's own choosing; and

h. such other injuries as may be shown by the evidence.

52. Mr. Joyner was never indicted. On information and belief, Pitt County prosecutors would not present the case to the grand jury to determine probable cause without a field test or lab results confirming Mr. Joyner actually possessed drugs.

53. In or around November 2024, the crime lab confirmed the sandwich bag contained no controlled substances. As he had repeatedly told Defendant Head, Mr. Joyner had a brownie in his pocket. And a brownie is, of course, not a controlled substance.

54. Because there was no evidence that he had possessed any heroin, Mr. Joyner's charges were dismissed on or about November 19, 2024. He was finally permitted to remove the ankle monitor and live his life as a free man. But he still suffers from the damages inflicted upon him by his wrongful arrest.

**Unconstitutional Policies, Customs, Training and Supervision by the City of Greenville Police Department**

55. The actions of Defendants Head and Howard during the interaction and unlawful arrest described herein were in contravention of appropriate police training and policies and were outside the bounds of policing standards.

56. At the time of Mr. Joyner's arrest, the GPD had inadequate customs or standards regarding (1) the use of field tests or a TruNarc when it is not immediately apparent that a substance contains drugs, and (2) the making of arrests in drug cases.

57. Upon closer examination, Defendants Head and Howard both expressed they could not tell what was in the sandwich bag. As the watch commander, Defendant Howard could have and should have instructed Defendant Head to confirm the sandwich bag contained drugs with a field test or TruNarc analysis before charging Mr. Joyner. The investigation yielded no other evidence of drug trafficking. And Defendant Head could have secured a warrant after confirming whether Mr. Joyner had heroin in his possession.

58. Defendant Head repeatedly asserted he did not have to test the drugs before obtaining an arrest warrant. Conversations at the scene reflect that the GPD officers were unclear about how to obtain field tests or access the TruNarc. As a result, Defendant Head charged Mr. Joyner with trafficking heroin because he had remnants of a brownie in his pocket instead of having the sandwich bag contents tested with field tests or the TruNarc.

59. Defendant City was put on notice of the violative policies, customs and practices of the GPD through the pattern of unconstitutional conduct of GPD officers in the time prior to Mr. Joyner's arrest.

60. Specifically, GPD had notice of its improper policies and customs with respect to its officers' (a) failure to use field tests and/or the TruNarc to test drug when it is not immediately apparent that a substance contains drugs and (2) deciding to make arrests in such cases on-scene, despite a lack of evidence, instead of delaying arrests to obtain testing results in drug cases.

61. The policies, practices and customs of the GPD at the time of Mr. Joyner's arrest – which were adopted, formally and informally, by Defendant City by and through City Manager Michael Cowin and Chief of Police Ted Sauls, Jr. – were known by Defendant City to create a serious risk of constitutional misconduct.

62. GPD had notice that its policies, practices and customs created a risk that misconduct like that by Defendants Head and Howard during their stop and arrest of Mr. Joyner would occur. GPD's policies, practices and customs were a moving force behind that misconduct.

63. In addition, the training provided to Defendants Head and Howard by Defendant City was woefully inadequate and caused Defendants Head and Howard to violate federal and North Carolina law and wrongfully arrest Mr. Joyner.

64. Prior to April 30, 2024, the GPD did not adequately train or supervise its officers to ensure they had reasonable knowledge, skills, and decision-making ability in regard to, *inter alia*:

a. identifying controlled substances;

b. conducting field tests of suspected controlled substances;

c. using a TruNarc to analyze suspected controlled substances;

d. making arrests in drug cases; and

e. in other ways that will be uncovered through discovery.

65. Defendant City was put on notice of a need for further and better training and supervision of officers at the GPD with respect to with respect to identifying controlled substances, conducting field tests of suspected controlled substances, using a TruNarc to analyze suspected controlled substances, and making arrests in drug cases.

66. At all relevant times, the GPD culture fostered by Defendant City openly permitted, and even sanctioned, arrests in drug cases without field tests or a TruNarc to confirm a suspect possessed drugs. Defendant City did not adequately train, supervise or otherwise deter officers from making arrests in drug cases without probable cause.

67. Defendant City knew its inadequate policies, customs, practices, training and supervision created a substantial risk of harm to citizens of Greenville, including Mr. Joyner. Defendant City, however, did nothing to remedy these deficiencies and continued to utilize those inadequate policies, customs, practices, training and supervision.

68. As a result, Mr. Joyner was wrongfully arrested for having remnants of a brownie in his pocket. These reckless and deliberately indifferent policies, customs, practices, training and supervision were a driving force behind Mr. Joyner's wrongful arrest.

## COUNT I
## VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983 Claim for Fourth Amendment Violation – Unreasonable Seizure/Malicious Prosecution (Against Defendant Head in his Individual Capacity)

69. Plaintiff herein incorporates all preceding paragraphs by reference.

70. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 for violation of rights protected by the Fourth Amendment of the United States Constitution, which applies to the actions of local governments pursuant to the Fourteenth Amendment. Defendant Head took all actions under the color of the law for purposes of § 1983.

71. In the manner more fully described above at ¶¶ 23-44, Defendant Head, under color of state law and within the scope of his employment with Defendant City and GPD, caused, instituted, and participated in the initiation of a criminal proceeding against Mr. Joyner despite the absence of probable cause.

72. Defendant Head's investigation of Mr. Joyner revealed that:

a. Mr. Joyner had no history of drug use or drug trafficking;

b. A thorough search of Mr. Joyner's person, property, and the car uncovered no drug paraphernalia or items indicative of drug sales; and

c. There was no evidence Mr. Joyner or the car interacted with anyone before the traffic stop.

73. The only evidence arguably suggesting Mr. Joyner possessed heroin was the sandwich bag contents in his pocket. But the incriminating nature of the brownie remnants in the sandwich bag were not immediately apparent to either Defendant Head or Defendant Howard. In fact, Mr. Joyner's innocent explanation for the contents – that is was a brownie – matched Defendant Head's initial impression – that it looked like brown sugar. And Defendant Head could have easily obtained a field test or TruNarc analysis of the sandwich bag contents, which would have exculpated Mr. Joyner.

74. Defendant Head caused Mr. Joyner to be arrested and seized pursuant to an arrest warrant that was not supported by probable cause.

75. The criminal proceedings described herein – Mr. Joyner's arrest, seizure and charges – were instituted by Defendant Head with malice. Defendant Head proceeded with the arrest and seizure without excuse or just cause and/or in reckless disregard of the rights of Mr. Joyner and without probable cause.

76. Defendant Head, with Defendant Howard's approval, intentionally and/or recklessly failed to pursue easily obtainable information – a field test or TruNarc analysis of the sandwich bag contents – that could have completely and clearly exculpated Mr. Joyner. The wrongful actions of Defendant Head caused misleading evidence and information to be presented for an arrest warrant with knowledge that his actions would result in criminal proceedings being pursued against Mr. Joyner.

77. Mr. Joyner was seized on April 30, 2024, as a result of the initiation of the criminal proceedings. He remained incarcerated pursuant to the wrongful criminal charges described herein up to and including June 12, 2024, when he was released on bond. Mr. Joyner remained under significant restrictions of his freedom and under threat of legal jeopardy until the dismissal of his charges on or about November 19, 2024, after the crime lab determined the brownie remnants contained no controlled substances.

78. The arrest of Mr. Joyner pursuant to an arrest warrant despite the absence of probable cause constituted an unreasonable seizure in violation of the Fourth Amendment. Defendant Head's actions violated 42 U.S.C. § 1983 by depriving Mr. Joyner of his clearly established constitutional right to be free from unreasonable seizures. Specifically:

a. Defendant Head secured an arrest warrant charging Mr. Joyner with trafficking heroin by unlawfully, willfully, and feloniously possessing 4-14 grams of heroin, in violation of N.C.G.S. § 90-95(H)(4), despite the absence of probable cause that Mr. Joyner possessed any drugs;

b. Defendant Head deliberately or recklessly disregarded readily available exculpatory evidence – field test or TruNarc of the sandwich bag contents – and obtained an arrest warrant not supported by probable cause;

c. Defendant Head deliberately or recklessly decided to execute this arrest and seizure despite his knowledge that he could delay such arrest and seizure while awaiting the results of lab testing of the contents of the sandwich bag without risk of flight; and

d. In other such ways that may be learned and/or proved through discovery and at trial.

79. Defendant Head's malicious prosecution of Mr. Joyner caused his seizure, arrest, and wrongful imprisonment. As a direct and foreseeable consequence of Defendant Head's misconduct, Mr. Joyner was unreasonably and unlawfully subjected to criminal prosecution, wrongful imprisonment, and restrictions of his freedom.

80. As a direct and foreseeable consequence of Defendant Head's misconduct set forth above, Mr. Joyner suffered physical, emotional, and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages described in this Complaint and to be proved through discovery and at trial.

81. Plaintiff is entitled to recover all available compensatory damages and special damages as defined under federal common law resulting from the violation of his civil rights and wrongful conduct described herein.

82. Plaintiff also seeks and is entitled to recover reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

## COUNT II
## VIOLATION OF CIVIL RIGHTS – 42 U.S.C. §1983 Claim for Fourth Amendment Violation – Failure to Intervene
## (Against Defendant Howard in his Individual Capacity)

83. Plaintiff herein incorporates all preceding paragraphs by reference.

84. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983 for violation of rights protected by the Fourth Amendment of the United States Constitution, which applies to the actions of local governments pursuant to the Fourteenth Amendment. Defendant Howard took all actions under the color of the law for purposes of § 1983.

85. Defendant Howard had a duty to intervene on behalf of a citizen whose constitutional rights were being violated by another officer. In the manner more fully described above at ¶¶ 23-44, Defendant Howard, under color of state law and within the scope of his employment with Defendant City and GPD, stood by without intervening to prevent the violation of Mr. Joyner's constitutional rights when Defendant Head initiated a criminal proceeding against Mr. Joyner despite the absence of probable cause.

86. Defendant Howard was the watch commander when he arrived on the scene. At the scene, Defendant Howard developed an understanding of the progress of the

investigation through his personal observations and communications, including with Mr. Joyner and Defendant Head.

87. Based on these observations and communications, Defendant Howard knew or should have known that:

a. Mr. Joyner had no history of drug use or drug trafficking;

b. A thorough search of Mr. Joyner's person, property, and the car he was riding in uncovered no drug paraphernalia or items indicative of drug sales; and

c. There was no evidence Mr. Joyner or the car interacted with anyone prior to the traffic stop.

88. Defendant Howard personally inspected the brownie remnants with Defendant Head and remarked that he honestly did not know what was in the sandwich bag. He certainly did not have enough information – nor did Defendant Head – on which to base probable cause for the arrest of Mr. Joyner.

89. Defendant Howard knew or should have known that Defendant Head could have pursued easily obtainable information – a field test or TruNarc of the sandwich bag contents – that could have completely exculpated Mr. Joyner. Defendant Howard knew that Defendant Head decided to forego a field test or TruNarc analysis and instead seek a warrant for Mr. Joyner's arrest for trafficking heroin despite the absence of probable cause.

90. Defendant Howard observed or had reason to know that Defendant Head was violating Mr. Joyner's rights by arresting him for trafficking heroin without probable

cause. As the watch commander at the scene, Defendant Howard had a realistic opportunity to intervene to prevent the harm from occurring. But he chose not to intervene.

91. Additionally, Defendant Howard had a realistic opportunity to intervene after the arrest of Mr. Joyner by instructing Defendant Head to conduct a field test or TruNarc analysis of the sandwich bag contents before shipping the drugs to the crime lab. With that intervention, Defendant Howard would have stopped the continuation of the criminal prosecution of Mr. Joyner that resulted in his unnecessary, prolonged seizure and imprisonment. But Defendant Howard failed to do so.

92. By his conduct and under color of law, during the constitutional violation described herein, Defendant Howard stood by without intervening to prevent the violation of Mr. Joyner's constitutional rights, although he had the opportunity to do so.

93. Defendant Howard's failure to intervene in the arrest and imprisonment of Mr. Joyner violated his clearly established Fourth and Fourteenth Amendment rights.

94. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, recklessly, and/or with deliberate indifference to Mr. Joyner's clearly established constitutional rights.

95. As a direct and foreseeable consequence of Defendant Howard's failure to intervene to prevent the violation of Mr. Joyner's clearly established constitutional rights, Mr. Joyner suffered physical, emotional, and psychological damages, out-of-pocket expenses, and consequential economic damages, as well as other damages described in this Complaint and to be proved through discovery and at trial.

96. Plaintiff is entitled to recover all available compensatory damages and special damages as defined under federal common law resulting from the violation of his civil rights and wrongful conduct described herein.

97. Plaintiff also seeks and is entitled to recover reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988.

**COUNT III**
**VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**
**UNCONSTITUTIONAL POLICIES AND PRACTICES**
**(Against Defendant City of Greenville, North Carolina)**

98. Plaintiff herein incorporates all preceding paragraphs by reference.

99. Defendant City was at all times material to this Complaint the employer of Defendants Head and Howard, as police officers of the GPD. Michael Cowin, in his official capacity as Greenville City Manager ("City Manager Cowin"), is and was at all relevant times the final policymaker regarding the conduct of GPD officers performing law enforcement functions on behalf of Defendant City, to the extent the City Manager has not delegated such decision-making to the Chief of Police, Richard Tyndall ("Chief Tyndall"). Chief Tyndall is and was at all relevant times also a final policymaker regarding the conduct of GPD officers performing law enforcement functions on behalf of Defendant City, working in concert with City Manager Cowin.

100. The violations of Mr. Joyner's civil and constitutional rights, as set forth herein, were the direct and proximate results of the then-existing customs, policies and practices established by City Manager Cowin and/or Chief Tyndall. Through these policies, customs and practices, the Defendant City expressly or tacitly encouraged,

ratified, and/or approved of the acts and/or omissions alleged herein and knew or should have known that such conduct was unjustified and would result in violations of constitutional rights, including those of Mr. Joyner.

101. The official and unofficial policies and customs of Defendant City knowingly, willfully, and recklessly disregarded the constitutional rights of the citizens of Greenville, North Carolina, including Mr. Joyner, in violation of 42 U.S.C. § 1983.

102. Specifically, the official and unofficial policies and customs promulgated by Defendant City, by and through City Manager Cowin and/or Chief Tyndall, were unconstitutional insofar as they:

a. Provided no or improper guidance on identifying controlled substances;
b. Provided no or improper guidance on conducting field tests of controlled substances;
c. Provided no or improper guidance on using and/or directing the use of a TruNarc to analyze suspected controlled substances;
d. Provided no or improper guidance on making arrests in drug cases;
e. Contained unreasonable and unclear standards and policies on making arrests in drug cases;
f. Had no policy or an inadequate policy regarding intervening to prevent constitutional violations by other officers; and
g. Were recklessly indifferent and manifestly disregarded the rights of the citizens of Greenville, including Mr. Joyner, in such other ways as will be proven during discovery and at trial.

103. Defendant City's official and unofficial policies and customs were each the moving force behind the unconstitutional acts of Defendants Head and Howard.

104. As a direct and proximate result of Defendant City's deliberate indifference to and/or reckless disregard for Mr. Joyner's rights, he suffered physical, emotional, and psychological damages, out-of-pocket expenses, and consequential economic damages. Plaintiff seeks and is entitled to compensation for these losses, and all other damages permitted under the law.

105. Plaintiff also seeks and is entitled to recover reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT IV
## VIOLATION OF CIVIL RIGHTS – 42 U.S.C. § 1983
## FAILURE TO TRAIN AND SUPERVISE
## (Against Defendant City of Greenville, North Carolina)

106. Plaintiff herein incorporates all preceding paragraphs by reference.

107. Defendant City had exclusive control over the training and supervision of GPD officers, including Defendants Head and Howard. Defendant City had a duty to maintain the training and readiness of its GPD officers to reasonably respond to situations like the one described in this Complaint.

108. Defendant City failed to properly train and/or supervise its officers regarding the appropriate and reasonable response to a situation such as this, as is manifest in the actions of Defendants Head and Howard.

109. Specifically, Defendant City failed to train officers of the GPD, including Officers Head and Howard, in the following respects:

a. Defendant City did not provide adequate training and/or supervision on the identification of controlled substances;

b. Defendant City did not provide adequate training and/or supervision on the use of field tests for suspected controlled substances;

c. Defendant City did not provide adequate training and/or supervision regarding the use of a TruNarc for suspected controlled substances;

d. Defendant City did not provide adequate training and/or supervision regarding the decision to make arrests in drug cases;

e. Defendant City did not provide adequate training and/or supervision regarding an officer's duty to intervene to prevent constitutional violations by other officers; and

f. Defendant City was otherwise recklessly indifferent and manifestly disregarded the rights of the citizens of Greenville in training and/or supervising GPD officers, including Defendants Head and Howard, in such other ways as will be proven during discovery and at trial.

110. Defendant Howard also failed to properly supervise Defendant Head at the scene, permitting him to cause the arrest and seizure of Mr. Joyner without probable cause despite knowing that his conduct posed an unreasonable risk that his actions violated Mr. Joyner's constitutional rights.

111. Defendant City created, maintained and executed the training and supervision set forth above, which constitute manifest and critical failures. Although Defendant City, which trained and supervised GPD officers, including Defendants Head

and Howard, knew these procedures were inadequate, dangerous and manifestly likely to cause harm, it did nothing to correct them.

112. The repeated and sustained failures of Defendant City to properly train and/or supervise GPD officers constituted deliberate indifference to and reckless disregard for the rights of Mr. Joyner and other members of the public.

113. Defendant City perpetrated these training and/or supervision failures despite having knowledge that it needed additional and/or better training and/or supervision of its offices with respect to the issues outlined *supra*.

114. Defendant City's failure to properly train and/or supervise GPD officers was the moving force behind the unconstitutional acts of Defendants Head and Howard.

115. As a direct and proximate result of Defendant City's deliberate indifference to and/or reckless disregard for Mr. Joyner's rights, he suffered physical, emotional, and psychological damages, out-of-pocket expenses, and consequential economic damages. Plaintiff seeks and is entitled to compensation for these losses, and all other damages permitted under the law.

116. Plaintiff also seeks and is entitled to recover reasonable costs and attorney's fees pursuant to 42 U.S.C. § 1988.

## COUNT V
## MALICIOUS PROSECUTION UNDER NORTH CAROLINA STATE LAW
## (Against Defendant Head in his Individual Capacity)

117. Plaintiff herein incorporates all preceding paragraphs by reference.

118. In the manner described more fully above at ¶¶ 23-44, Defendant Head subjected Mr. Joyner to an unlawful prosecution without probable cause. He did so deliberately and with malice.

119. Defendant Head, within the scope of his employment with GPD, accused Mr. Joyner of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Mr. Joyner without any probable cause. In doing so, Defendant Head caused Mr. Joyner to be arrested pursuant to a warrant on charges for which there was no probable cause. These charges were instituted and continued maliciously, resulting in injury to Mr. Joyner.

120. Mr. Joyner did not possess any drugs on April 30, 2024. He merely had the remnants of a brownie in a sandwich bag.

121. Defendant Head caused criminal proceedings to be brought against Mr. Joyner without probable cause and without any reasonable belief in guilt. Additionally, Defendant Head failed to pursue an easily obtainable field test or TruNarc analysis of the sandwich bag contents which would have exculpated Mr. Joyner.

122. Mr. Joyner's charges were dismissed on or about November 19, 2024, after the crime lab determined that the brownie remnants contained no controlled substances.

123. The misconduct described in this Count was objectively unreasonable and undertaken with malice – either intentionally and without excuse or just cause, or in reckless in disregard of the rights of Mr. Joyner without probable cause – and in total disregard of the truth and Mr. Joyner's innocence.

124. As a direct and proximate result of Defendant Head's misconduct, Mr. Joyner was subjected to malicious prosecution under North Carolina law, and suffered damages as alleged in this Complaint. Mr. Joyner is therefore entitled to recover damages as alleged herein and to be proved through discovery and at trial.

**<u>COUNT VI</u>**
**NEGLIGENCE/GROSS NEGLIGENCE/RECKLESSNESS**
**(Against Defendants Head and Howard in their Individual and Official Capacities)**

125. Plaintiff herein incorporates all preceding paragraphs by reference.

126. At the time of the events discussed herein, Defendants Head and Howard owed Mr. Joyner a duty of due care with respect to their involvement in his arrest for an alleged drug offense.

127. Defendants Head and Howard were negligent in their acts and omissions in all of the ways described in the preceding paragraphs – including their failures to follow settled principles for the following duties:

a. To ensure that citizens were not wrongfully arrested and charged with crimes they did not commit;
b. To conduct criminal investigations professionally and with the goal of finding the truth;
c. To pursue readily available information that would exculpate a suspect;
d. To intervene to prevent a fellow law enforcement officer from arresting an innocent person without probable cause; and
e. To follow proper law enforcement procedures and the United States Constitution in conducting all criminal investigations and arrests.

128. Defendants Head and Howard's conduct discussed herein was negligent, grossly negligent, and reckless, and breached their duty of due care to Mr. Joyner by participating in the unlawful arrest and detention of Mr. Joyner and by failing to intervene to prevent the unlawful arrest and detention of an innocent person.

129. Defendants Head and Howard were acting in the course and scope of their employment as GPD officers, and were negligent, grossly negligent, and/or reckless in failing to recognize that Mr. Joyner was not guilty of any drug offense.

130. Defendant Head and Howard are sued in their official capacity as to Count VI, to the extent of the waiver of immunity for their negligence. Defendant City is the responsible party on this official capacity claim. On information and belief, Defendant City had procured insurance coverage and/or participated in a governmental risk pool that provides coverage for all times relevant hereto. In doing so, Defendants have waived any governmental or public officer immunity that might apply to Count VI.

131. Defendants Head and Howard are also sued in their individual capacities for actions that were grossly negligent and exceeded the scope of their authority.

132. As a direct and proximate result of the Defendants' negligence, gross negligence, and/or recklessness as set forth herein, Mr. Joyner suffered physical, emotional, and psychological damages, out-of-pocket expenses, and consequential economic damages. Plaintiff seeks and is entitled to compensation for these losses, and all other damages permitted under the law.

## COUNT VII
## PUNITIVE DAMAGES
## (Against Defendants Head and Howard in their Individual Capacities)

133. Plaintiff herein incorporates all preceding paragraphs by reference.

134. The conduct of Defendant Head – in unlawfully seizing Mr. Joyner pursuant to an arrest warrant despite the absence of probable cause – and Defendant Howard – in failing to intervene to prevent violation of Mr. Joyner's constitutional rights – was willful, wanton and/or done with actual malice in that:

a. They unlawfully arrested Mr. Joyner without probable cause for a crime he did not commit;

b. They failed to pursue an easily obtainable field test or TruNarc analysis of the sandwich bag contents which would have exculpated Mr. Joyner prior to his arrest;

c. They failed to pursue an easily obtainable field test or TruNarc analysis of the sandwich bag contents before submitting the drugs to the crime lab for testing, knowing that it would take months for the sandwich bag contents to be tested; and

d. They acted in a willful and wanton manner in such other ways described herein and to be proven through discovery and at trial.

135. The acts of Defendants Head and Howard alleged above were willful, wanton and/or done with actual malice, and they evidenced a reckless disregard for and indifference to the rights and safety of the public, including Mr. Joyner, who as a result,

was arrested, imprisoned, and had his freedom restrained for months for a crime he did not commit.

136. As a direct and proximate result of Defendants Head and Howard's outrageous, aggravated, willful, wanton and malicious conduct, Mr. Joyner is entitled to recover punitive damages from Defendants Head and Howard in an amount to be determined by a jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays the Court enter judgment in his favor and against Defendants, jointly and severally, and award relief as follows:

1. That Plaintiff has and recovers compensatory damages against all Defendants, jointly and severally, in an amount to be determined at trial;
2. That Plaintiff has and recovers punitive damages against Defendants Head and Howard in an amount to be determined at trial, in order that such award will deter similar prohibited behavior by Defendants and other officials and law enforcement officers in the future;
3. That the Plaintiff recovers the costs of this action, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and these costs be taxed against the Defendants, including prejudgment interest as of the date of the filing of this complaint;
4. That the judgment against Defendants bear interest as provided by law, including interest as provided under state law on the state law claims;
5. That the Plaintiff be granted a trial by jury on all issues so triable; and
6. For such other relief the court deems appropriate.

## DEMAND FOR JURY TRIAL

The Plaintiff respectfully demands a jury trial on all issues of fact that may arise from the pleadings in this cause.

This the 11th day of January, 2026.

**EDWARDS BEIGHTOL, LLC**

/s/ Catharine E. Edwards
Catharine E. Edwards
N.C. Bar No.: 52705
cee@eblaw.com
Nicholas Hartigan
N.C. Bar No.: 60492
njh@eblaw.com
P.O. Box 6759
Raleigh, NC 27628
Phone: (919) 636-5100

***Attorneys for Plaintiff Jason Donnell Joyner***